BEAM, Circuit Judge,
dissenting.
At the outset, I admit that, insofar as I have been able to discern, Minnesota has a judicial system peopled with individuals of intellect, integrity and character, fully capable of making difficult decisions, consistent with the interests of the people of the state. However, such a condition is beside the point because many other states have achieved the same essential goals without trenching upon clearly established constitutional rights. The court today holds that laws prohibiting candi-' dates for public office from voicing their views as to issues pertinent to their conduct in office, or their opponent’s conduct in office, or from appearing or speaking to like-minded citizens, are not only permissible but are apparently necessary to a well-ordered democracy. Because in my view such a result flatly contradicts the edicts of the First Amendment, I respectfully dissent.
The court and I part ways in three critical respects. First, the court misconstrues Minnesota law, reading it with such latitude as to contradict one-hundred fifty years of development in Minnesota’s judicial selection processes. Second, the court supplants constitutionally guaranteed rights with its own notions of preferred judicial policy. Finally, the court countenances restrictions on fundamental, protected activity that are neither necessary nor narrowly tailored. In the final analysis, the court sustains a set of restrictions which probably have no practical effects other than to quash election-related speech and association, and thus undermine a democratic process — precisely the fear that prompted the drafting of the First Amendment.
I.
Prior to even contemplating the suppression of otherwise protected First Amendment activity, a state must assert a compelling interest. Presumably, that interest must reflect a state’s actual and *886 lawfully adopted policy. The court accepts as “undeniably compelling” appellees assertion that in effecting Canon 5, the Minnesota Supreme Court furthered Minnesota’s interest in maintaining the “independence” of its judiciary. Ante at 864. Certainly, all states share such an interest generally — such is the preferred state of the American judiciary.[26] But different sovereigns give different meanings to the term “independence.” I believe the court has misconstrued Minnesota precedent, and in doing so has used it to justify a policy prescription that lacks support in Minnesota’s constitutionally established public regimen.
The court, without further analysis, simply accepts appellees’ claim that Minnesota has “historically pursued the ideal of an independent judiciary.” Ante at 865. It relies heavily on the Minnesota Supreme Court’s observation in Peterson v. Stafford, 490 N.W.2d 418 (Minn.1992), that while the federal and its own system differ, they both “create and maintain an independent judiciary as free from political, economic and social pressure as possible.” Id. at 420. In this, the court finds license to sustain as consistent with Minnesota-public policy anything which it considers to enhance judicial independence. But this latter term is subject to broad and varied interpretations, and merely begs the question “independent from what?” While appointed judges are “independent” from the electorate, elected judges, once elected, are hardly “dependent” on the electors, and are “independent” from other elected officials. However, we are not called upon to sustain our own notions of “independence,” but Minnesota’s. We must therefore read the Minnesota Supreme Court’s statement in Peterson in light of that state’s public policy as prescribed by its citizens. As it turns out, Minnesotans have consistently rejected all attempts to narrow or curtail their elective franchise when it comes to selecting judges. Rather, they have repeatedly strengthened popular control over their judiciary.
The debate whether to appoint, retain or directly elect judges predates Minnesota’s founding. The federal drafters debated it in Philadelphia. See The Anti-Federalist Papers & the Constitutional Convention Debates 120-27 (Ralph Ketcham ed., Mentor 1986). Alexander Hamilton defended their subsequent choice in print, arguing that elected judges would suffer “too great a disposition to consult popularity to justify a reliance that nothing would be con- *887 suited but the Constitution and the laws.” The Federalist No. 78, at 471 (Clinton Rossiter ed.1961). Anti-Federalists hotly contested that position. Brutus counseled trepidation at the advent of a judiciary “altogether unprecedented in a free country” which was to be “rendered totally independent, both of the people and the legislature.” Brutus XI, Letter of January 31, 1788, in Ketcham, ante, at 293. See also, George Mason, Speech in Opposition to the Constitution, and Patrick Henry, Speech to the Virginia Ratifying Convention, both in Ketcham, ante, at 174, 212 (arguing that the federal judiciary made the courts too far removed from the citizenry).
The federal founders ultimately decided upon lifetime appointments, subject to good behavior, placing us (ostensibly) beyond the cavil of partisan activity and populist suasion. U.S. Const, art. III. As federal judges, we understandably have a bias for this method. Yet, we should not confuse the rationale behind our federal system with some universal judicial raison d’etre, for different sovereigns value different policies. Some elect only a few officers and rely largely on appointments, while others insist on electing virtually every office-holder. Since Hamilton and Brutus debated, the arguments on each side have been well known, and were so at Minnesota’s founding.
Minnesota’s first judiciary arrived under the auspices of the United States with the Northwest Ordinance of 1787, which provided the Northwest Territories with congressionally-appointed judges and governor-appointed local magistrates. Northwest Ordinance §§ 4, 7 (1787); see generally, Hiram F. Stevens, History of the Bench & Bar of Minn. (1904). In 1849, Congress created the Territory of Minnesota and provided a similarly appointed judiciary. Act of Congress, March 3, 1849 §§ 2, 9, 11, 9 Stat. 403. Minnesotans did not warm to these arrangements. As one state founder noted, “it has been the complaint of the Territory ... that we have to submit to have our Judges sent to us and have no voice in the selection ... and [the people] have looked forward with hope to the time when they could elect their own men.” The Debates & Proceedings of the Minn. Constitutional Convention 495 (1857) (“Democratic Debates & Proceedings ”). That chance came in 1857 when Congress authorized Minnesotans to draw up a constitution. Act of Congress, Feb. 26, 1857, 11 Stat. 166.
Minnesota chose an interesting time to seek statehood. With the Civil War three years off, and the Supreme Court’s decision in Dred Scott v. Sandford, 60 U.S. (19 How.) 393, 15 L.Ed. 691 (1856), one year past, any prospective new state necessarily stood in the eye of a hurricane.[27] Against this backdrop, on June 1, 1857, Minnesotans elected delegates to a constitutional convention. One historian gave the following description. “The feeling between and within political parties was bitter. Republicans were not just Republicans but ‘Black Republicans’ and ‘Nigger Lovers.’ The Democrats were divided into ‘Regular’ and ‘Moccasin’ Democrats, but were united for convention purposes.” Julius E. Haycraft, Territorial Existence & Constitutional Statehood of Minnesota (1946), republished in 1 Minn.Stat. Ann. 145, 151; see generally, William Anderson, A History of the Constitution of Minnesota (1921). Moreover, “[s]o intense was the feeling *888 that the Republicans and Democrats would not meet in the same convention. The result was two conventions; delegates of each party held separate sessions in different rooms in the old capitol.” Haycraft, ante, at 151. The two bodies met separately, largely without consultation. Even after a conference committee produced a compromise document, each convention refused to sign a document s’oiled by the other’s signatures, so each separately signed largely identical documents. Id. at 151-52.
The records of these proceedings demonstrate that Minnesota’s founders grappled with precisely the same contours as their federal forebears. The Republicans steadfastly insisted on an elected judiciary, but did debate the form of those elections. Debates & Proceedings of the Constitutional Convention for the Territory of Minn. 334-35, 402 (1858) (“Republican Debates & Proceedings ”). The question of politics arose when a Mr. Galbraith proposed an amendment requiring that judicial elections never be held on the same day as an election for any other office. He reasoned that “the excitements of mere political and party issues should be kept as far as possible. from the election of the judges — that the people should elect the Judges, upon their merits as judges — that they should be elected with the view of making them as independent of political parties as possible.” Id. at 406. In opposition, a Mr. Lowe argued, “I do not believe it will be possible to separate the election of judges from political considerations.” Id. The convention rejected Galbraith’s amendment, and opted for concurrent judicial elections.
The Democratic convention proved far more contentious. After a committee failed to agree on a judicial selection method, the issue came to the convention floor. ,Democratic Debates & Proceedings, ante, ' at 493-509. Those favoring the Hamiltonian appointment model did so for two reasons, fear of populism and fear of political entanglement.
First, they feared the populism' that might result from an elected judiciary. One vigorous opponent, a Mr. Setzer, argued:
The great object of an appointed Judiciary, is to secure stability upon the part of the government, by having a power within the State conservative enough to restrain the waves of popular excitement, when they sweep over us as they have done in different States for years past.... Judges represent no constituency and are elected by no constituency. They represent nothing except the abstract ideas of equity and justice.
Id. at 495-96. The “abstract ideas of equity and justice” heralded were those set out in Dred Scott — the culmination of the grand experiment that seventy years earlier Brutus had observed was “altogether unprecedented in a free country.” And the “waves of popular excitement” that so rankled delegates were the popular sentiments of radical abolitionist fervor. He continued, “[w]e see it in Wisconsin, in Iowa, and in all those States where popular excitement in reference to negro-worship and disunion has had its effect upon an elective Judiciary.” Id.
Minnesota’s founding debate did not turn entirely on slavery. Those opposed to an elected judiciary also raised precisely the same, eminently sensible concerns troubling the court today. Another delegate, a Mr. Meeker, argued:
I contend that the Judges who are elected, are elected by parties, and are the mere fuglemen of caucuses. The best trickster or the best manager of caucuses is just as likely to be the nominee of a party as the most learned man in the nation.... [T]he greatest curse that *889 could befal [sic] any people would be the establishment of a political court .... [A]nd our Judges ... if they are to be' elected, must necessarily be essentially political Judges; they cannot be anything else.
Id. at 500. They feared the instability such a system would create. “Whichever party is in the ascendancy will change the system of jurisprudence to its own standard, and there will be no security, no stability in anything.” Id. at 501. Accordingly, a Mr. Sherburne recommended adopting the venerable appointment mechanisms common along the east coast. Id. at 497.
The prevailing delegates, those favoring judicial elections, met these arguments head-on. Said a Mr. Emmett:
We hear a great deal of talk about an independent Judiciary. The phrase is in everybody’s mouth. What does it mean? Independent of whom? Independent of what? Independent of the people ... “I I say then that in order to correct the errors of Judges — and it may be important to correct them, — the office should be made elective.
Id. at 503. And as regards the fear that politics would infect an elected system, he continued, “if the people are incapable of selecting their Judges, they are also incapable of selecting the man who is to appoint the Judges .... The governor always selects men belonging to his own political party, while the people often select them regardless of parties.” Id. A Mr. Curtis responded to Mr. Sherburne: “[I]s a sufficient argument in favor of an appointed Judiciary, that it is old? Is it all that can be said in its favor, that it has grown hoary by age and usurpation — because it is all covered over from one end to the other by corruption and fraud?” Id. at 498.
As these exchanges demonstrate, the arguments surrounding election and appointment were well known and well met. Despite the concerns raised then and marshaled again by the court today, Minnesotans of both parties opted for an elected judiciary. Ultimately, they more feared the potential politics of an appointed bench and saw popular election as the proper remedy. Given the political climate, they desired more control over their judiciary. That was the policy adopted by the people of Minnesota.
Minnesota’s electorate has never since intimated a change in this policy. Indeed, it has frequently reaffirmed judicial accountability to the electorate.[28] In 1912, for instance, the legislature required judicial candidates to run on a non-partisan ballot. Peterson, 490 N.W.2d at 420. That statute in no way restricted a candidate’s political activities or ability to educate the voters as to his merits, opinions or values. Moon v. Halverson, 206 Minn. 331, 288 N.W. 579, 580-81 (1939). The reform’s objective was to ensure that candidates were elected on their own merits. Id. at 580. A merit-based election necessitates the flow of information regarding candidates to the electorate.
Minnesota has four times rejected the so-called Missouri Plan, whereby the governor could fill vacancies by non-partisan appointment, and such appointees would later be subject only to a retention vote. Maynard E. Pirsig, The Proposed Amendment of the Judiciary Article of the Minn. Constitution, 40 Minn. L.Rev. 815, 815-19 *890 (1955-56); Peterson, 490 N.W.2d at 421 n. 14. Again, voters retained their system of direct electoral control.
In 1948, a commission recommended that candidates run against a specific incumbent rather than against the field. Peterson, 490 N.W.2d at 421 n. 14. It argued, “[w]here several incumbents are running for re-election, each should stand or fall on the basis of his own record. The present system does not permit this since opposing candidates run against the field.” Report of the Constitutional Comm’n of Minn. 43-44 (Oct. 1, 1948). Minnesota law was amended accordingly. See 14A Minn.Stat. Ann. § 204B.06; Gustafson v. Holm, 232 Minn. 118, 44 N.W.2d 443 (1950) (sustaining requirement that judicial candidates declare which specific seat is sought). Such seat-specific elections increase the electorate’s focus on a specific judge’s conduct.
Thus, since first permitted to select its own judiciary, Minnesota has consistently favored electorally-responsive judges. Its citizens have considered and rejected the court’s policy concerns,[29] and have rejected appointment and retention systems that would have curtailed or eliminated popular control. Minnesota has repeatedly affirmed its citizens’ right to elect their judges, and has bolstered that franchise with laws enhancing merit-based elections and furthering the flow of information regarding the candidates to the electorate.[30] Canon 5 subverts this policy. The suppression of election-related speech and association does not enhance the franchise. In fact, it militates against the public’s ability to elect judges based on their merits by denying citizens a reasonable vehicle for self-information. The court assures that candidates may still discuss their “character, fitness, integrity, background (with the exception of their political affiliation), education, legal experience, work habits and abilities.” Ante at 882. However, these are simply not all of the qualities that piqued the interest of Minnesota’s founders, nor those which fully inform voters who are charged with the selection of Minnesota’s judiciary.
*891 The question here is whether Minnesota has expressed a sufficiently fundamental policy interest in “independent” judicial elections to even warrant our proceeding to the next stage of our constitutional inquiry. Certainly, in Peterson, the Minnesota Supreme Court instructed us that Minnesota has an interest in making its judiciary as independent “as possible.” 490 N.W.2d at 420. But as the Minnesota Supreme Court cannot trump its citizens’ prescribed policy, “as possible” cannot be read to include restrictions which curtail the elective franchise. Because Canon 5 does precisely that, I believe the court has clearly misapplied Minnesota law.
II.
The preceding discussion may prove largely academic, because the restrictions at issue in this case were not enacted by the Minnesota legislature but rather were created by the Minnesota Supreme Court itself. While that court has not yet ruled that its own regulations comport with fundamental state policy, it could just as easily do so. And as a federal court, we defer to state courts on questions of state law. Indeed, we wade into such questions only in the most dire of circumstances, for instance where state law is being intentionally tortured to discriminate against a protected minority, see, e.g., Bouie v. City of Columbia, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964), or where an error of state law works a singular national impact, see, e.g., Bush v. Gore, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). But while we ought not inject ourselves into the state law question, we are charged with enforcing federal law. Federal law, and in particular the Constitution, operate to protect the rights of citizens against encroachment by both federal and state governments. In my view, even accepting arguendo that the people of Minnesota did actually intend to immunize their judicial candidates from some of the rigors of an election campaign, Canon 5 still flatly contradicts controlling precedent and violates the Constitution.
The court repeatedly emphasizes the importance of judicial independence, a proposition with which I heartily agree. Judicial independence is of the utmost importance to a fair and well-functioning judicial system. Moreover, I agree that a state has an interest not only in warding off an actual breakdown of that independence, but also the appearance of such. Every court to address this or a similar question has recognized the importance of this principle. Moreover, all have recognized, again rightly so, that by virtue of their function, judges fundamentally differ from other elected officials. The court cites extensively to these authorities. Yet the court omits noting that almost all of these courts have then further recognized that such policy notions cannot trump constitutionally-enshrined rights.[31] The Constitution makes strict demands. Of *892 ten times, important and justifiable public policy goals must bow before its restraints. As judges, we must put aside our inclinations as jurists, lawyers, residents, citizens, and parents, and enforce the Constitution’s restraints. The Constitution protects the most basic elements of our democratic processes, in particular the rights of candidates and citizens to express and receive views pertinent to public office, and to associate in the election context with others of their own choosing. Because Canon 5 sharply curtails, if not outright bans these activities, regardless of how laudable its purpose, it must be struck down.
Because election speech and association he at the heart of the First Amendment, any restriction thereof must survive strict scrutiny. Eu v. San Francisco County Democratic Cent. Comm., 489 U.S. 214, 223, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989). A restriction on otherwise protected activity must be necessary and narrowly tailored to serve a compelling state interest. Id. at 222, 109 S.Ct. 1013. “[I]t is the rare case in which ... a law survives strict scrutiny,” Burson v. Freeman, 504 U.S. 191, 211, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992), yet the court today, with little reservation, affirms a set of restrictions more sweeping in scope and effect than ever adopted elsewhere. -I discuss in turn, the First Amendment rights implicated by the court’s decision, the court’s purported interests and the need for and tailoring of the challenged restrictions.
A.
The Supreme Court has consistently afforded election speech and association the highest protection. “The free exchange of ideas provides special vitality to the process traditionally at the heart of American constitutional democracy — the political campaign.” Brown v. Hartlage, 456 U.S. 45, 53, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982). Few, if any, state interests prove sufficiently compelling to trump these activities. While “a state has a legitimate interest in upholding the integrity of their electoral process ..., when a State seeks to uphold that' interest by restricting speech, the limitations on state authority imposed by the First Amendment are manifestly implicated.” Id. at 52, 102 S.Ct. 1523. Canon 5 runs roughshod over the clearly established speech and associational rights of candidates, political parties and the voting public. That alone should foreclose any thought of Canon 5’s constitutionality.
Candidates for public office enjoy both speech and associational rights.
The candidate, no less than any other person, has a First Amendment right to engage in the discussion of public issues and vigorously and tirelessly to advocate his own election and the election of other candidates. Indeed, it is of particular importance that candidates have the unfettered opportunity to make their views known so that the electorate may intelligently evaluate the candidates’ personal qualities and their positions on vital public issues before choosing among them on election day.
Buckley v. Valeo, 424 U.S. 1, 52-53, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (emphasis added). To that end, the First Amendment protects the right to campaign and restricts states to preventing only actual fraud and corruption.[32] Brown, 456 U.S. at 55, 102 S.Ct. 1523.
*893 Candidates similarly enjoy protected association rights. These interpose themselves “at the crucial juncture at which the appeal to common principles may be translated into concerted action, and hence to political power in the community.” Tashjian v. Republican Party of Conn., 479 U.S. 208, 216, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986). A candidate’s association with a political party, organization or another candidate provides a basic means of election communication. Associational rights work hand in hand with a candidate’s speech rights, for without the former, the latter may prove meaningless. “ ‘The right to associate with the political party of one’s choice is an integral part of this basic constitutional freedom.” ’ Id. at 214, 107 S.Ct. 544 (quoting Kusper v. Pontikes, 414 U.S. 51, 57, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973)).
The First Amendment protects not only speakers’ rights, but also those of listeners. Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). A campaign implicates not only the candidate’s right to self-expression, but also voters’ rights to receive the candidate’s message. A state may not “hamstring! ] voters seeking to inform themselves about the candidates and the campaign issues.” Eu, 489 U.S. at 223, 109 S.Ct. 1013. Nor may a state limit public debate as “[i]t is simply not the function of government to ‘select which issues are worth discussing or debating.’ ” Brown, 456 U.S. at 60, 102 S.Ct. 1523 (quoting Police Dep’t of Chicago v. Mosley, 408 U.S. 92, 96, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972)); accord United States v. Playboy Entm’t Group, Inc., 529 U.S. 803, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). In short, “[a] state’s claim that it is enhancing the ability of its citizenry to make wise decisions by restricting the flow of information to them must be viewed with some skepticism.” Eu, 489 U.S. at 228, 109 S.Ct. 1013 (quotation omitted).
Voters’ associational rights parallel their right to receive information. “To the extent that party labels provide a shorthand designation of the views of party candidates on matters of public concern, the identification of candidates with particular parties plays a role in the process by which voters inform themselves for the exercise of the franchise.” Tashjian, 479 U.S. at 220, 107 S.Ct. 544.
A party’s speech and association also receive protection, particularly in the election context. Eu, 489 U.S. at 224, 109 S.Ct. 1013; First Nat’l Bank of Boston v. Bellotti, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). In endorsing or inviting a candidate to speak, a party “reflects its members’ views about the philosophical and governmental matters that bind them together [and] seeks to convince others to join those members in a practical democratic task,” an election. Colorado Republican Fed. Campaign Comm. v. FEC, 518 U.S. 604, 615, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) (plurality opinion of Justice Breyer). Limitations on a party’s ability to endorse a candidate “hamper! ] the ability of a party to spread its message.” Eu, 489 U.S. at 223, 109 S.Ct. 1013. “[A] political party has a right to ... select a standard bearer who best represents the party’s ideologies and preferences.” Id. at 224, 109 S.Ct. 1013 (citations and quotations omitted). The suppression of a party’s right to associate with candidates of its *894 choice, renders it powerless.[33] “The Party’s attempt to broaden the base of public participation in and support for its activities is conduct undeniably central to the exercise of the right of association.” Tashjian, 479 U.S. at 214, 107 S.Ct. 544.
Canon 5 trenches upon these rights in a variety of ways. The “announce” clause, for instance, effectively bans campaigning itself. The court disagrees, saying “[t]he judicial candidate simply does not have a First Amendment right to promise to abuse his office.” Ante at 862. But the court proves too much. The Supreme Court established in Brown that no candidate for any office possesses such a right. “[T]he state may ban such illegal agreements without trenching on any right ... protected by the First Amendment.” 456 U.S. at 55, 102 S.Ct. 1523. Beyond prohibiting fraud and corruption, and the appearance of the same, a state may prevent judicial candidates from prejudging or pledging outcomes in specific cases or even in particular types of cases. But beyond such, a state cannot further unreasonably curtail election-related speech.
The announce clause, however, bars discussion of all disputed legal and political issues. The court’s narrowing construction to “issues likely to come before the candidate,” ante at 881, is meaningless. See Buckley v. Illinois Judicial Inquiry Bd., 997 F.2d 224, 229 (7th Cir.1993) (recognizing the true scope of such a “limitation”).[34] Even could such a category be properly cabined, it would still roam far beyond the narrow category of speech left unprotected by the Court in Brown. The court assures us, for instance, that a candidate may discuss his “judicial philosophy.” Ante at 882. I cannot fathom “disputed legal issues” more likely to come before a court than the proper role of stare decisis, narrow or strict construction, original intent and substantive due process. Yet are these not captured by the term “judicial philosophy?” The term is as sweeping as the court’s allegedly narrow construction.[35]
Along with the announce clause, the restrictions on attending and speaking at party gatherings, and the bans on seeking or using endorsements, and on self-identi *895 fying as a party member similarly tread upon protected First .Amendment rights. Obviously, by banning such activities, Canon 5 directly impacts the rights of judicial candidates. The court insists that this impact goes no further, that Canon 5 affects only the rights of candidates, and not those of any third parties. Ante at 873-75. But this cannot be, as laws that affect candidates necessarily affect voters. Bullock v. Carter, 405 U.S. 134, 143, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). The court strives mightily to justify the impact wrought on candidates’ rights, arguing for instance that judicial candidates have less interest in certain types of policy debate than do other types of candidates. Ante at 862. Such arguments do little tó justify collateral effects on the rights of others.[36]
Canon 5 affects third parties in a variety of ways. For instance, the announce clause curtails voters’ rights to hear a candidate’s views on those issues most pertinent to future conduct in office. By preventing candidates from seeking endorsements, Canon 5 potentially prevents voters and parties from gauging a candidate’s attitude towards a party, something central to many voters’ decision-making processes. Despite the court’s protestations, it also de facto curtails a party’s ability to endorse the candidate of its choosing. Parties are unlikely to endorse their preferred candidate so long as they fear handing an opponent a potential election issue — specifically, the specter of an ethics violation — even if none exists. This in turn curtails voters’ rights to hear parties’ views as to candidates. Additionally, by preventing candidates from attending or speaking at party gatherings, Canon 5 trenches upon parties’ rights to express themselves in the manner of their own choosing, specifically by presenting the candidate of their choice.
Our First Amendment' rulings usually parse the hypothetical. We worry about “potential” chilled speech, and the supposed ill effects that might flow from quashed association. Presented only with the text of Canon 5, one might well hypothesize that restricting candidates’ abilities to express their views and to associate with political parties would lead to two results: higher rates of incumbent retention; and disproportionate campaign fund-raising. This hypothesis follows from a rudimentary understanding of public campaigns and the judiciary.
Campaigns for public office, judicial, legislative or executive, necessarily favor incumbents. Incumbents have better name recognition, better resources, are usually better staffed, and barring some recent disaster, are afforded the presumptions of experience and competence. Of the three branches of government, the judiciary seems to least capture the public’s attention. Judicial incumbents, therefore, may enjoy these benefits to an even greater extent.
Unlike most of our Firgt Amendment cases, however, this case need not stick to the hypothetical. Canon 5 has been in effect in Minnesota for some time, in varying forms. We therefore can look to recent elections to see whether these supposed harms have come to pass. Minnesota is no exception to the rule that the public pays the least attention to the judiciary. Indeed, one Minnesota Supreme Court Justice has observed of judicial elections that “it’s pretty darn hard to get people to care.” Amendment of Canon 5 *896 of the Code of Judicial Conduct: Hearing Before the Minn. Supreme Court 44 (1997). Election statistics bear this out. In 1996 one-half million voters cast a ballot in the Presidential race yet did not vote in the Supreme Court race. League of Women Voters of Minnesota, Choosing Minnesota’s Judges: An Examination of the Present System and Alternative Proposals 6 (1998). Moreover, 86% of responding voters said they needed more information about judicial elections and 77% observed they got less information about judicial than other elections. Id.
Fund-raising and other election data demonstrate disturbing distortions in a supposedly democratic process.[37] During the 2000 election cycle, of those judges up for election, only five of sixty-seven trial court benches were contested and only one of four appeals court judges faced a challenger. In 1998, only ten of eighty-nine trial court benches were contested.[38] Judicial fund-raising reflects the same bias. In the 2000 election, the four incumbent Supreme Court justices seeking re-election raised a combined $505,070.63. Of their opponents, only two raised sufficient funds to warrant disclosure. These two together raised only $23,582.67. Candidate Filings, Minnesota Campaign Finance and Public Disclosure Board (2000). A stable judiciary is, on balance, a laudable pursuit and perhaps Minnesotans have no cause to find fault with any of their judges. But it is just as likely that, at least in part, these imbalances flow from a lack of information resulting from the suppression of election-related speech and association and from other impediments inherent in Canon 5.
Not surprisingly then, in recent history prior to the 1998 election which spawned this suit, only two incumbent judges had lost elections. See Mary Ellen Egan, Judging for Himself, City Pages 4-5 (June 17, 1998). The record details appellant Wersal’s campaign difficulties, hamstrung by both fund-raising and speech limitations. Indeed, an ethics complaint forced him out of the 1996 campaign for fear of losing his law license and being unable to support his family. Another Supreme Court candidate, Michael Demoss, faced a similar problem after making comments about his views on abortion. With challengers unable to create traction by discussing actual issues, or to raise funds, the results in judicial elections are hardly surprising.
Minnesota’s judicial elections thus reveal the precise results one might suspect Canon 5 would produce. Moreover, its chilling effects on electoral activity are precisely those which spurred the First Amendment. It might be naive to argue that incumbents must never be permitted to use their offices to bolster their own positions — such conduct seems inimical to poli *897 tics generally. But American tradition has long recognized that the best defense against such conduct is the right of a people to freely associate, assemble and speak. It may be, as a matter of policy, that an appointed judiciary best protects our liberties. I certainly think so, and the court obviously agrees. But Minnesota has made a different choice, and having chosen an elective selection method it cannot then turn around and quash candidates’ constitutionally guaranteed rights. The upshot is this: when a state opts to hold an election, it must commit itself to. a complete election, replete with free speech and association. Certainly, a state may regulate corruption as in Brown, the integrity of the voting process as in Burson and the form of its ballot as in Timmons v. Twin Cities Area New Party, 520 U.S. 351, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997). But the state may not unduly curtail speech and association, for they are too central to First Amendment interests in the election process.
B.
The court does not discuss the foregoing authorities. Rather, it tries to sidestep this entire doctrinal inconvenience with a simple argument — that judges are different. It surmises that given the nature of their office, judges, even when elected, warrant different treatment under the First Amendment.[39] The court identifies three interests, all under the rubric of enhancing judicial independ'ence, which it deems sufficiently compelling to warrant the suppression of fundamental rights: safeguarding a judge’s ability to apply the law neutrally; maintaining the public confidence in judicial impartiality; and insulating judges from political pressure. Ante at 864, 867. Many courts have noted, and I agree, that judges differ from other officials. As a matter of constitutional law, however, the judiciary has no more or less right than any other coordinate branch to insulate itself from the rigors of public debate, particularly in the election context. The court embarks on a path long since foreclosed, as the Supreme Court has directly and pointedly refused to permit such specialized treatment, even given the court’s stated concerns.
The judiciary may not rely on the “maintenance of confidence in the judicial system,” essentially the interest advanced by the court today, as a justification for the suppression of protected expression. Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 833, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978). In Landmark Communications, Virginia attempted to rely on this interest to justify a statute making it a misdemeanor to report on'confidential judicial disciplinary proceedings.[40] Id. *898 Recognizing that “the law gives judges as persons, or courts as institutions ... no greater immunity from criticism than other persons or institutions,” the Court ruled “neither the Commonwealth’s interest in protecting the reputation of its judges, nor its interest in maintaining the institutional integrity of its courts is sufficient to justify the subsequent punishment of speech at issue here.” Id. at 839, 841, 98 S.Ct. 1535 (quotation omitted, emphasis supplied). “[Ijnjury to official reputation is an insufficient reason for repressing speech that would otherwise be free [and] the institutional reputation of the courts, is entitled to no greater weight in the constitutional scales.” Id. at 841-42, 98 S.Ct. 1535 (quotation omitted, emphasis supplied).
Landmark Communications extended a well-established body of precedent forbidding judicial efforts at self-isolation from public debate. Potential “disrespect for the judiciary” and worries' of the “disorderly and unfair administration of justice” cannot compel the suppression of protected expression. Bridges v. California, 314 U.S. 252, 270, 62 S.Ct. 190, 86 L.Ed. 192 (1941). In Bridges, the Court prevented a trial court from silencing newspaper editorial criticism of its conduct during ongoing legal proceedings, because:
The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion .... [A]n enforced silence, however limited, solely in thq name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt, much more than it would enhance respect.
Id. at 270-71, 62 S.Ct. 190.
This argument grows all the stronger in the election context. In Wood v. Georgia, 370 U.S. 375, 379-80, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962), the Court reversed a contempt order issued against a sheriff who told a grand jury that he opposed its having been empaneled. The state argued such conduct constituted a “clear and present danger” to the administration of justice. Id. at 387, 82 S.Ct. 1364. However, both the sheriff and the judges involved were elected officials charged with public responsibilities. Id. at 390, 395, 82 S.Ct. 1364. The sheriff, therefore, “had the right to enter the field of political controversy, particularly where his political life was at stake. The role that elected officials play in our society makes it all the more imperative that they be allowed freely to express themselves on matters of current public importance.” Id. at 394-95, 82 S.Ct. 1364 (citation omitted); see also, Craig v. Harney, 331 Ú.S. 367, 370, 376-77, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947) (“Judges are supposed to be men of fortitude, able to thrive in a hardy climate.... Judges who stand for reelection run on their records. That may be a rugged environment. Criticism is expected.”); Pennekamp v. Florida, 328 U.S. 331, 336-40, 66 S.Ct. 1029, 90 L.Ed. 1295 (1946) (rejecting a “threat to the impartial and orderly administration of justice” as justification for a contempt order stemming from a political cartoon); accord Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (holding that without good cause, criminal trials must be open to the public); Nebraska *899 Press Ass’n v. Stuart, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976) (affirming principle of judicial transparency).
The First Amendment therefore forecloses the use of criminal or contempt sanctions to suppress criticism of the judiciary. The use of punishing civil and professional sanctions to accomplish the same end is equally offensive. I see little difference between truthful criticisms leveled at a judge by a newspaper editor or elected official on one hand, and a judicial candidate on the other.[41] I similarly see little difference between the use of the contempt power, and the use of a Supreme Court’s ability to regulate bench and bar, to silence judicial criticism. Judges, elected or otherwise, are thought to be citizens of honor, integrity and fortitude. By holding office they subject themselves to public criticism.[42] Monitor Patriot Co. v. Roy, 401 U.S. 265, 274, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971). And as elected officers, this holds doubly so for Minnesota’s judiciary. A judicial candidate has a right to criticize the opinions, philosophies, rulings and public statements of the incumbent, who has a concomitant right to respond in kind. In sustaining Canon 5, the court permits precisely what these precedents say may not be done, except that rather than only protecting judges from the .speech of others, they are apparently designed, according to the court, to protect incumbent judges and judicial candidates from the effects of their own speech. Such paternalistic notions have long been suspect, and are patently unconstitutional. Even granting the court’s contention that Canon 5 will prevent some undesirable conduct, the vast majority of the speech and association suppressed will be legitimate, wholesome, democratic activity. Contrary to the court’s assumption, judges, in this context, are not different. In the eyes of the First Amendment, they are the same.[43]
C.
I turn finally to the more mundane application of the Supreme Court’s strict scrutiny jurisprudence. Even accepting that á restriction may serve a compelling state interest, in order to warrant the suppression of otherwise protected speech and *900 association, it must be necessary to achieve its purpose. Burson, 504 U.S. at 198, 112 S.Ct. 1846. Despite the court’s best efforts, Canon 5 fails this test.
Because a regulation that does not achieve its stated end cannot be necessary, the touchstone of necessity is effectiveness. Eu, 489 U.S. at 228-29, 109 S.Ct. 1013; Tashjian, 479 U.S. at 214, 107 S.Ct. 544. For instance, in Eu, the state argued that its ban on political party endorsements of primary candidates served the compelling interest of protecting primary voters from confusion and undue influence. Eu, 489 U.S. at 228, 109 S.Ct. 1013. The Court doubted whether the restriction could achieve its stated rationale because of all the organizations with an interest in primary elections, the ban silenced only political parties. Id. at 228 n. 18, 109 S.Ct. 1013. Many other equally or more vocal groups remained free to endorse whomsoever they wished. Moreover, “the growing number of endorsements by political organizations using the labels ‘Democratic’ or ‘Republican’ has likely misled voters into believing that the official governing bodies were supporting the candidates.” Id. As the restriction did not effect its goal, it was not necessary.[44]
Canon 5 suffers from precisely this same flaw. It bars judicial candidates from attending or speaking at “political organization gatherings” or from seeking, accepting or using endorsements from a “political organization,” and defines a “political organization” as a “political party organization.” Canon 5 purports to safeguard a judge’s ability to apply the law neutrally, to maintain the public confidence in judicial impartiality and to insulate judges from public pressure. Given its restricted application, however, Canon 5 simply cannot achieve these goals.
The court worries that by appearing at, speaking to or being endorsed by a political party, a candidate will appear “in hoc” thereto. As a general proposition, this is simply wrong. The Supreme Court recognized in Eu that one cannot conclude from such conduct that a candidate will necessarily tow a party line. 489 U.S. at 225 n. 15, 109 S.Ct. 1013. But even accepting the court’s premise, Canon 5 falls far short of its goals because it fails to include candidate appearances before, speeches to, or endorsements by other politically active organizations. Candidates remain free to consort with organizations such as the National Organization of Women, the NAACP, the Christian Coalition, the National Association of Manufacturers, the AFL-CIO or the NRA. Many of these organizations are implicitly, and some explicitly, aligned with one or another of the major parties.[45] Candidates remain free to seek and use the endorsements of the insurance lobby, the Minnesota Trial Lawyers Association, or any other political or quasi-political organization not organized *901 as a “political party.” If the court’s “appearance” concerns are valid, this ought to cause it grave anxiety.
The court argues that political parties are more likely to command a candidate’s acquiescence to party positions on the bench. Ante .at 872-73, 876. Were this true, the court’s argument would still fail because one does not satisfy the necessity requirement merely by solving for the greatest influence, but rather by addressing all significant influences. ' The court’s assertion, however, is untrue. Of all the politically-oriented organizations around, the two major parties are both “big-tent” organizations — ideologically consistent only in their aggregate distinctions one from another. Within each party a variety of opinions on most issues may be found. A candidate’s appearance at a party function hardly indicates endorsement of its views. (I am certain that Republicans everywhere will be either delighted or dismayed to know that Ralph Nader’s appearance at their national convention last fall signified his support for their platform. See Eun-Kyung Kim, Nader Addresses Youth Convention, AP Online, WL 24553132 (August 2, 2000).) A speech at a party function supports nothing beyond the candidate’s own words, and an endorsement suggests only that the endorser finds a candidate more palatable than any other presently available.
On the other hand, quasi-political organizations, particularly those that focus on a single or only a few issues, are much more likely to demand and command a candidate’s attention and support. The Federalist Society, for instance, is an organization dedicated to strict construction. Were it to endorse a candidate, it stands to reason that the candidate would be seen as a “strict constructionist.” Abortion issue groups are among those most likely to endorse only candidates who will be thought to adhere strictly to the relevant “party line.” Given their focus and intensity, • such groups are much- more capable than political parties of bringing their members’ wrath to bear on elected officials including judges who stray from their point of view.
The record reflects the increasing role in and influence over judicial election politics exerted by these groups. Among those groups active in recent Minnesota judicial elections were state and local bar associations, the League of Women Voters, an organization called “People for Responsible Government,” Minnesota Women Lawyers, Lavender Magazine and the Minnesota Family Council. Such groups can easily bring pressure to bear in judicial elections.[46] Two 1996 examples from judicial elections in other states bear this out. In Nebraska, Supreme Court Judge David Lanphier was defeated in a retention vote after authoring an opinion striking down Nebraska’s term limits law. His defeat, largely over the opinion, appears to have been engineered by a single-issue organization named “Citizens for Responsible Government.” Similarly, Justice Penny White of the Tennessee Supreme Court was hounded out of office after voting with the majority to remand a death penalty case. The influence of such groups featured prominently in the testimony when the Minnesota Supreme Court held a hearing on whether to expand Canon 5 to exclude all such groups, rather than just political parties.
*902 The court leaves single-issue political parties such as the Twin-Cities Area New Party, which brought the suit in Timmons, entirely out in the cold. Many smaller parties including the Right to Life Party, the Natural Law Party, and until this recent election cycle, the Green Party, tend to focus on only a few key issues. These groups are distinguished from advocacy groups only by having exercised their right to organize as a political party. Under the court’s opinion, having done so will cost them their rights to engage in election-related speech and association.
If the Minnesota Supreme Court is truly worried about the appearance of or actual judicial bias, it ought to be concerned with more than political parties. By ignoring other political groups, Canon 5 leaves unregulated sources of funding, endorsements and pressures, which, if the court’s concerns about judicial partiality are justified, do much more to undermine public perception than political parties. In fact, barring political party involvement will most likely make the system less tenable. By removing the only organizations that endorse candidates across a spectrum of issues, voters are left with only the shrill voice of narrow advocacy coming from special interest groups. Because the canons do not achieve their stated goals, they cannot be considered necessary, and there-: fore cannot pass strict scrutiny.
D.
Not only must a restriction on speech be necessary, it must also be narrowly tailored to use the least restrictive means in achieving its stated goal. Burson, 504 U.S. at 198, 112 S.Ct. 1846. In doing so, a restriction must suppress as little protected activity as possible. “If a less restrictive alternative would serve the Government’s purpose, the [state] must use that alternative.” Playboy, 120 S.Ct. at 1886. Canon 5 runs rampant through acres of protected speech, and in doing so eschews many less restrictive options.
If the court’s goals do accurately reflect the actual interests of the people of Minnesota, they could be most efficiently and effectively achieved by amending the Minnesota Constitution to allow for the appointment, rather than the election of judges. This would achieve the court’s interests in one stroke, without requiring the suppression of a single protected word. In undertaking its “narrowly tailored” analysis, the court does not discuss this option. Of course, doing so would reopen for the court the sticky problem of Minnesota’s having repeatedly expressed a preference for elected judges.
Compliance with the First Amendment does not require so radical a change, for other states have successfully adopted a variety of mechanisms to insulate their judges from the pressures of elected office without impermissibly trenching on protected constitutional rights. Various states, including Nebraska and Tennessee, have adopted the Missouri Plan, discussed in Section I, whereby initially-appointed judges stand in periodic retention elections. Other states have used a more piecemeal approach, remedying specific problems. Some, for instance, alleviate the financial pressures faced by judges for 'whom the bench provides a livelihood by lengthening terms of office or by providing generous pensions in order to ease the transition back to private practice. Of course, Minnesota’s failure to adopt any such scheme does not license the Minnesota Supreme Court to impose on judges and their putative supporters ethical canons abusive to their First Amendment rights.
III.
In sum, the court starts with a series of premises, many of which I accept. The *903 Supreme Court of Minnesota has every right to regulate the state’s bench and bar. It may protect its judiciary against both actual and the appearance of partiality. It may adopt measures tempered to do so in the ordinary course of its judiciary’s conduct. However, that principle of judicial independence, as has been recognized by almost every court to take up the question, must give way before rights which, unlike the court’s policy, have been constitutionally secured. Judges, whatever their differences from other officials, have no more right than others to avoid the rigors of public debate and public elections. No matter what the wisdom of placing the judiciary beyond the rigors of such activities, and no matter what selection method we as federal judges may prefer, the people of Minnesota have adopted an elective judiciary — a system which under our Constitution, must come replete with speech and associational rights.
Because the court finds compelling an interest that is not shared by the people of Minnesota, trumps well established speech and associational rights with values not adopted by the citizens of the state, permits the erection of an unconstitutional self-insulating barrier between the judiciary and the public, and permits regulations that are neither necessary nor narrowly tailored, I must respectfully dissent.

. The court distorts my views on judicial independence, implying, ante at 864, that I would sacrifice such independence, and, presumably, its alleged by-product, “justice under law,” on an altar of "democratic self-government.” (1 assume the court is referring to my concern for the democratic election process.) The court's statements are seriously at .variance with my views and my arguments in dissent. This case is not about rules under which a neutral judiciary dispenses justice under canons of ethics designed to support judicial independence, once the selection process is over. I wholly agree that such a system should exist and be designed to enhance, through reasonable state regulation, the ideals of judicial independence. This case is about the point at which free speech and association collide directly with an attempt by the Minnesota Supreme Court to manage (and I believe over manage) the election process in the name of judicial independence of some definition.
My dissent simply and appropriately recognizes and discusses these competing interests and reaches a result in line with the Constitution and Supreme Court precedent. It is the court that insists that "one of the principles should give way completely to the other,” that is, judicial independence, whatever that proves to be under the court's analysis, should trump the First Amendment when the election of a judge is at stake. There is absolutely no support in federal law for the court’s position.

. Abolitionist sentiment ran high in Minnesota and, while not reaching the levels in other states, did result in some violence. Interestingly, among the slaves brought to Minnesota during the pre-civil war period was Dred Scott, who from 1835-40 lived with his "owner,” Surgeon J. Emerson, at Fort Snelling. Stevens, ante, at 30-36.

. Minnesota courts have consistently struck down rules depriving judicial offices of their elective nature. See State ex rel La Jesse v. Meisinger, 258 Minn. 297, 103 N.W.2d 864, 866 (1960); State ex rel Smallwood v. Windom, 131 Minn. 401, 155 N.W. 629, 633 (1915); State ex rel Rosckes v. Dreger, 97 Minn. 221, 106 N.W. 904, 906 (1906); State ex rel Jordan v. Bailey, 37 Minn. 174, 33 N.W. 778, 779 (1887).

. Indeed, the Minnesota Supreme Court specifically refused to resurrect the policy debates undergone at the constitutional convention.
There are many arguments, on grounds of both principle and expediency, against the election of judges, either in special cases or generally. Such arguments do not enter into our consideration. The fundamental law of this state is, and always has been, that the selection of judges must be submitted to the electors.
La Jesse, 103 N.W.2d at 866.

. The court attempts to divorce my review of Minnesota judiciary history from that undertaken by the Minnesota Supreme Court in Peterson, and paints the latter as justifying its conclusion today. Ante at 866 n. 13. But the review undertaken in Peterson supported a regulation wholly different from that before us today. In Peterson, the Minnesota Supreme Court reconciled Minnesota history with a measure requiring the judicial election ballot to designate incumbent jurists as such. 490 N.W.2d at 424. The Minnesota Court found that initiative consistent with Minnesota history and sustained it because it enhanced the flow of information to Minnesota voters, which stands in stark contrast to the measure before us today which suppresses that same flow of information. Rather than address what the Minnesota Supreme Court meant by “independent” in the proper context, the court simply transports the Minnesota court’s purposely cabined conclusions into today's opinion. But as my review, and that undertaken in Peterson indicate, in the context of Minnesota public policy, an "independent judiciary” means judges elected by well-informed, independent voters. In undermining that process by stifling the free flow of information, the court merely exacerbates the partial transfer of the Minnesota judicial selection machinery into the hands of other narrow political influences as noted elsewhere in this dissent.

. See e.g., Suster v. Marshall, 149 F.3d 523 (6th Cir.1998) (striking down restrictions on judicial campaign spending); Buckley v. Illinois Judicial Inquiry Bd., 997 F.2d 224 (7th Cir.1993) (striking down "announce” clause); Stretton v. Disciplinary Bd. of the Supreme Court of Pa., 944 F.2d 137 (3d Cir.1991) (narrowing construction of "announce clause”); Weaver v. Bonner, 114 F.Supp.2d 1337 (N.D.Ga.2000) (striking down canon restricting advertising and election speech); Butler v. Alabama Judicial Inquiry Comm’n, 111 F.Supp.2d 1224 (M.D.Ala.2000) (restraining enforcement of campaign advertisement and conduct restrictions); ACLU of Florida v. The Florida Bar, 744 F.Supp. 1094 (N.D.Fla.1990) (enjoining "announce” canon); In re Chmura, 461 Mich. 517, 608 N.W.2d 31 (narrowing canon to prohibit only knowingly false statements), cert. denied, — U.S. --, 121 S.Ct. 77, 148 L.Ed.2d 40 (2000); J.C.J.D. v. R.J.C.R., 803 S.W.2d 953 (Ky.1991) (striking down "announce” and other campaign restrictions).

. The court cites Burson where the Supreme Court sustained the prohibition of “the solicitation of votes and the display or distribution of campaign materials within 100 feet of the entrance to a polling place.” 504 U.S. at 193, 112 S.Ct. 1846. While not a traditional "time, place, and manner” restriction in that it was content-specific, the rule curtailed *893 speech only within that 100-foot bubble. Id. at 197, 112 S.Ct. 1846. Against a vast history of election fraud and intimidation at polling places, the Court permitted only an extremely narrow, location-specific restriction on campaign speech. Burson hardly supports the absolute bans imposed by Canon 5.

. The court relies in part on Timmons v. Twin Cities Area New Party, 520 U.S. 351, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997), in which the Court sustained a ban on fusion- candidates — those appearing on the ballot as representing more than one party. That law governed form of the ballot but did not restrict parties from endorsing the candidate of their choice. This prevented small parties from bootstrapping their way into public election funds by endorsing a major party candidate, and then claiming the resulting votes. As it did not affect candidate or party speech and associational rights, the Court sustained the rule. That case does not support the banning of all election-related discussion and association.

. Construing similar language, similarly curtailed, Judge Posner noted:
There is almost no legal or political issue that is unlikely to come before a judge of an American court, state or federal, of general jurisdiction. The civil war in Yugoslavia? But we have cases in which Yugoslavs resist deportation to that nation on the ground that they face persecution ...; and some years ago the Illinois courts were embroiled in a custody fight involving a child who didn’t want to return to the then Soviet Union with his Soviet parents.
Buckley, 997 F.2d at 229.

.To truly grasp the impact of today’s opinion, one must consider the plight of the judicial candidate who in 2002 must decipher Minnesota ethical obligations. Between them, Canon 5, the district court's opinion and the court's opinion today supply three different versions of acceptable speech. Moreover, all three remain contingent on the Minnesota Supreme Court’s agreeing with the court's construction, for if it does not, the judicial candidate may still face sanctions. The threat of chilled speech is too great to countenance.

. Of course, the court belies its own contention with the argument, addressed infra, that political parties work a unique effect upon the electoral scheme. Ante at 872-73, 876-77. How the court reconciles its concern with party involvement with its assurances that the rights of candidates alone are affected escapes me.

. Prior to every Supreme Court election, the Minnesota State Bar Association holds a plebiscite between the candidates among its members. The results display in dramatic fashion the extent to which an incumbent may count on support from groups most vested in the judiciary. Since 1974, incumbents have out-polled their challengers by the following margins: 1974: 91% to 9% and 85% to 15%; 1978: 77% to 23% and 95% to 5%; 1982: 95% to 5%; 1992: 61% to 39% and 85% to 15%; 1996: 75% to 25% and 90% to 10%. Minnesota State Bar Ass’n, Judicial Elections Task Force Report & Recommendations 32 Appendix D (1997). While this case has been pending, the 2000 election cycle has come and gone. I occasionally use the most recent data, which postdates the record on appeal.

. These numbers reflect a consistent trend. Since 1980, the number of contested trial benches of those facing election were as follows: 2 of 25; 0 of 25; 5 of 56; 9 of 54; 2 of 67; 4 of 93; 5 of 82; 6 of 42; 14 of 111. Minnesota State Bar Ass'n, Judicial Elections Task Force Report & Recommendations 7 (1997).

. The court dallies briefly with an analogy between judges and civil servants, drawing heavily on United States Civil Service Commission v. National Association of Letter Carriers, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). There, the Court found compelling the interests of forging a civil service capable of enforcing laws without regard to party allegiances, and in avoiding the appearance of bias among federal employees in order to maintain the public confidence. Id. at 565, 93 S.Ct. 2880. The analogy fails. Offices are made elective rather than appointive in order to introduce a degree of public control. Given the discretion that judges wield, that voters would desire such control is hardly surprising. The state's interests in these two areas are quite divergent.

. The court may seek to cabin Landmark Communications as merely preventing the criminalization of speech whereas this case regards an administrative or professional sanction. The statute in Landmark Communications made the challenged conduct a misdemeanor and subjected the paper to a $500 fine. While criminal in form, the actual harm in that case was much less severe than the threat judicial candidates face in Minnesota. Failure to abide by ethical canons can subject *898 a lawyer or a judge to sanction, removal or disbarment. In terms of gravity, the restrictions at issue here pose much the greater danger. See In Re Primus, 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978) (holding that a state's interest in effective judicial administration must bend before an attorney's First Amendment rights).

. The court argues that Minnesota "seeks not to shield judges from published criticism, but to prevent them from deserving such criticism.” Ante at 867 n. 14 (citations and quotations omitted). But the court's cure kills the patient. The worry, presumably, is that candidates will do or say things that pledge or seem to pledge them to certain outcomes in return for support, thus threatening judicial impartiality. The cure is to ensure that candidates can do nothing at all, thus destroying the election Canon 5 set out to save. Whether the court likes it or not, facing public criticism, whatever the source, comes with being a public official. Moreover, it is most certainly part of being a public candidate. This regulation flies in the face of both.

. Couching these prohibitions as necessary professional regulations falls similarly short, for the Supreme Court has repeatedly favored First Amendment expression over professional ethical regulations. See Ohralik v. Ohio State Bar Ass’n, 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978); In re Primus, 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978).

.To bolster its "judges are different” argument, the court relies in part on Cox v. Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965), where the Court reviewed a statute prohibiting the picketing of a courthouse with the intent to influence a judge, juror or court officer in the course of his duties. Id. at 560, 85 S.Ct. 476. The Court reversed the conviction on the grounds that an official had misrepresented to the defendant that his protesting was legal. Id. at 569-70, 85 S.Ct. 476. Despite this holding, the court engaged in a lengthy dictum discussing the statute itself. The statute, the Court observed, regulated only conduct, and did not infringe upon speech or assembly at all. Id. at 563, 85 S.Ct. 476.

. Ordinarily lawmakers may address problems piecemeal rather than having to propose all-encompassing solutions. Indeed, permitting "over-inclusiveness” and "under-inclusiveness” underpins basic rationality review. See Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). Such is not the case regarding fundamental rights, however, where we enforce a much higher standard. Playboy, 120 S.Ct. at 1888. Here, failure to solve the entire asserted problem is fatal. See, e.g., 44 Liquormart, 517 U.S. 484, 116 S.Ct. 1495, 134 L.Ed.2d 711 (Opinion of Stevens, J.); Discovery Network, 507 U.S. at 418, 113 S.Ct. 1505. Strict scrutiny imposes a much heavier burden on Canon 5 than on the "time, place and manner” restrictions reviewed in Cornerstone Bible Church v. City of Hastings, 948 F.2d 464, 470-71 (8th Cir.1991).

. Indeed, statistics from the 2000 election indicate that NAACP members voted for democratic candidates at a higher rate than did members of the democratic party.

. During the 2000 campaign, two Supreme Court justices received between eight and fifteen percent of their total contributions from one plaintiffs law firm, which had previously been accused of attempting to buy elections with tobacco settlement money. Candidate Filings, Minnesota Board of Campaign Finance & Public Disclosure (2000). Canon 5 does not solve electoral problems, but merely selectively sweeps them under the rug.